Good morning, Your Honor. Kathy Huang on behalf of Helen Worthington. May it please the Court I'd like to reserve five minutes for a rebuttal. Please proceed. Thank you, Your Honor. The last time we were before the Ninth Circuit Court, you affirmed the dismissal of the case of Engelbrecht v. Worthington based on perjury, and that's because plaintiffs had repeatedly lied under oath throughout the case, making it impossible for the Court to believe a word plaintiffs had to say about the accident. You further granted Worthington's motion for sanctions, requesting for an evidentiary hearing, and you ordered the District Court to have a hearing. Specifically, you wanted to know answers to three questions. First, when did Plaintiffs' Counsel learn that plaintiffs were lying under oath? Second, what actions of any Plaintiffs' Counsel then took? And third, what further sanctions, if any, are appropriate? And unless Your Honors have any specific questions, I would like to quickly just summarize the main points to each of those questions. My main question for you is what you think the specific, fairly erroneous, factual determination that the District Court made here, because it's a pretty high standard. And I understand, you know, these parties have been in litigation for years. It was sent back to determine if attorney sanctions were appropriate in addition to the dismissal of the case, which is quite a significant sanction and rarely done. And so I guess I'm just curious on what you think, and if you can point me to what you think of the best evidence you have that the District Court here met that high standard of clearly erroneous. Okay. First of all, the issue on appeal is District Court's misapplication of the law, and we believe that that's reviewed on the de novo standard. But we can also point to the fact... Well, but the facts have to be misapplication of the law. Is that not right? I mean... No, that is correct, Your Honor. Okay, so yes, I understand that. But I'm just focused on the facts right now. Sure. And what fact do you think was illogical, implausible, or without support in the record? What we found is the District Court's factual findings in denying our motion for sanctions was directly contrary to his factual findings where he granted the motion to dismiss. And I'd like to just pinpoint to some of the main contradictory factual findings. First of all, the District Court dismissed the case because he felt that the plaintiff cannot be believed. And yet when he denied our motion for sanctions, he felt that counsel was justified in continuing to believe plaintiffs had not committed perjury. But even this was contrary to evidence. When you said... Because I think you were pulling things from the 2013 order and then also things from the 2016 decision denying the motion for sanctions. So is there any juxtapositioning going on here with what you say with respect to what the District Court found? Some of what you're pulling from the 2013 order that caused you to appeal and then it was sent back. I was just getting confused because it seemed like some of the facts were getting... The judge's decisions were getting... You were pulling from one order and then also from the other. Correct. And I'm sorry, let me clarify that. I was using the factual findings underlying the District Court's dismissal order and I'm contrasting it with his factual findings that were directly contrary to his own findings in the prior dismissal order. But he had an evidentiary hearing in the meantime. Is that not significant? Yes, it is. And just to address that point, even based on the evidence that came out in the evidentiary hearing, emails between counsel and Engelbrecht made it clear that since the first deposition and then the second deposition, very early on in the case in the fall of 2009, that counsel had doubted Engelbrecht's veracity. So the fact that the judge found that counsel was justified in continuing believing him was contrary to the evidence that came out. And just to give you an example, in the second deposition, let me back up, one of the most was the fact that he testified positive for amphetamines based on urine and blood samples that were extracted from him within hours of the accident. Even then... Okay, I mean, I don't think there's any dispute amongst the three of us. I shouldn't speak for Judges Gould and Merguia. Mr. Engelbrecht is a liar. He lied about his meth use. It's a given. What were the lawyers supposed to do in response to that? I understand he testified truthfully at trial, and the trial judge issued the ultimate sanction in your client's favor. He dismissed the case. And now you want a sanction of some kind, apparently against the lawyer, the lawyers that were involved in representing the plaintiff. A, what were they supposed to do, different than what they did. B, what are you asking for in terms of a sanction in this case? Two questions. To answer your first question is, what they were ethically obligated to do was spelled out in the State Bar's decision in the formal opinion, and I'll give that cite for you. Were they supposed to go back and amend their answers to discovery requests for admission and interrogatories, or were they supposed to withdraw? Their duties were simple and straightforward. They were supposed to meet with their client, talk about whether or not he had testified falsely under oath, and if indeed there was perjury under oath, then to advise the client to correct that deposition testimony that's clearly false immediately so that Worthington is not forced to litigate under false pretenses. And by not doing so, it's in direct violation of California Professions Code, Rule 5200, where members of the California Bar are only supposed to employ means only as are consistent with truth, not mislead the judge or any other judicial officer by an artifice or false statement of fact or law. As far as what we're requesting sanctions, I think our briefs have said it very clear that throughout this case, Mr. Engelbrecht lied, and then we would place lies with more lies. We take issue with the fact that he allegedly told the truth at trial. We don't believe that his meth use via suppository is a true story either, but we don't know because he sprung that on us two weeks into trial and admitted to some of the perjury. But what is true, what is false, we don't know. And the court decided he cannot believe a word Mr. Engelbrecht had to say. No, we've crossed that threshold. We know he's not believable. The court dismissed the case in your favor. What were you seeking? What are you seeking in terms of a sanction? Are you asking for money? Um, are you, are you, I mean... We are asking for money. We are asking for monetary sanctions against counsel. Because you were required to prepare for and defend at the time of trial things that you wouldn't have had to defend had they amended their discovery responses and revealed that the client had been lying. Is that what you're saying? We're saying that they knew Mr. Engelbrecht had been lying repeatedly under oath since the beginning of the case. Then we gave specific example that they knew there were repeated perjury following the first deposition. This was August 2009. Emails between counsel and their client made it clear that counsel doubted the veracity of these testimony. And then following the second deposition, we caught him planting false evidence. And then a few months after, in December 2009, more emails between counsel and client made it clear that counsel knew that their client had lied. What do they do? Absolutely nothing as far as counseling their client to tell the truth, correct the false testimony immediately. As a result, we have to spend millions of dollars, in excess of $4 million, to litigate to uncover third-party evidence that would expose his lies again and again. So is that what you're looking for, is a monetary sanction of $4 million? Yes, Your Honor. What does the lawyer do, though, when it's also looking at, I think it's formal opinion number 1983-74, which says attorney cannot divulge client competences without the client's consent? So, I mean, this seems to be a law school exam ethics question, you know, pitting these two obligations on a lawyer and how do they reconcile this? And how can you say that the district court clearly erred in its determination in applying these two to the facts here? That's a great question and thank you for finding the site. Formal opinion 1983-74 makes it very clear that once the attorney suspects there's been perjury, this is the first step that the attorneys should take. They shall immediately have a private conference with his or her client, explain to the client that the attorney's opinion is that the client has committed testimonial perjury and the basis for that opinion. Didn't the court judge find that the lawyers had, in fact, consulted and met that requirement? No, in fact, the district court specifically found that counsel, that counsel Liebeck testified that he did not even seek Mr. Engelbrecht's consent to tell Worthington and the court about the change. I'm sorry, but is that pre-evidentiary hearing or post-evidentiary hearing? This came from, that was post-evidentiary hearing. That's the district court's order, post-evidentiary. Correct, correct. Because I thought I read that the district court said the lawyer here did the best that they could. They found out what was happening in terms of the drug use. They worked with the client, I think trying to balancing out these two obligations and ultimately worked for the client to testify truthfully at trial. He weighed the credibility of Mr. Liebeck and the attorney here. I'm just trying to figure out how we then say that that was clearly erroneous. What Judge Harney found was that counsel Liebeck never even asked Mr. Engelbrecht's consent to immediately inform the court or Worthington that there was perjury. Counsel also agreed and admitted that he never did that. In fact, Mr. Engelbrecht testified similarly. I just want to just briefly recite the question and answer between Mr. Ergo, attorney for Worthington and Mr. Engelbrecht. This is during the first evidentiary hearing. Question to Mr. Engelbrecht. Was there ever any discussion between the two of you, meaning Mr. Engelbrecht and counsel Liebeck, as to whether any of your testimony in deposition was false? Answer, no. Question, so that subject never came up, correct? Answer, I don't think he ever asked me that, no. Question, was there ever any discussion at these meetings as to whether you should advise Worthington that your testimony at deposition had been false? Answer, no. And quickly to address your earlier question about sort of the conflict between the duty of confidentiality and duty of candor, our position is that duty of confidentiality is not even triggered, and that's because under California Rules of Professional Conduct, Rule 3-100, that you can disclose client information if there's informed consent from the client. We know from Mr. Engelbrecht's testimony that he indeed consented. He testified that a year before trial, he wanted to do the right thing. However, when asked why he didn't advise Worthington or the court about the fact that he had intentionally conducted perjury, Mr. Engelbrecht claimed that because he didn't know that he had an opportunity to advise either the court or Worthington, or that he didn't know how to do it. So had counsel done the very basic ethical duty of advising his client to correct the deposition testimony that was clearly false, immediately Worthington would not have to spend so much money trying to expose the lies. What do you want to reserve? Thank you. Thank you, Your Honor. I'm Matt Hodel from Irvine, California, representing Hodes Millman and Kevin It took this court's direction seriously, and it worked on diligently complying with it. We had pre- and post-hearing full briefing, three days of hearings in 2016, live or deposition testimony read into the record from 30 witnesses, four of whom were expert witnesses. 2,000 pages of testimony were presented, a 36-page detailed opinion addressing every question, and every question was addressed thoughtfully. This is a narrow appeal. I heard Judge Mergier, you asked counsel a couple times, where was the clearly erroneous factual finding? They can point to nothing. They make this argument that the district court pointed out before, if you're trying to impeach the lawyers with Mr. Engelbrecht, isn't that ironic that you say you can't believe Mr. Engelbrecht on anything, and yet when you come here to tear the lawyers down, you want to use Mr. Engelbrecht's testimony about it. You cannot have it both ways. Let me just ask you though, should your clients have withdrawn from the case? I mean, in light of everything that's come out here, you know, it seems like California State Bar Formal Opinion, the one that was referenced throughout the briefing here today, 198374, states that attorney does not have a duty to advise the court in civil case when the attorney's client has committed testimonial perjury, but it also states that the attorney must take remedial action or withdraw. And I guess, what's your response? The response is that what California says, and by the way, the ABA is the same on this point too, even Model Rule 3.3 talks about how the lawyer should remonstrate with the client. And that's what Mr. Leibniz did here. When Mr. Engelbrecht came to him about a year before trial and began to tell him, began to admit that some things in his testimony were not right, and then he spent a lot of time working with Mr. Engelbrecht to make him admit a lot of things that he'd never admitted before. I think that's what Ms. Wong was referring to right now, the client wanted to do the right thing. I think that's what the time period she was talking about. So he has the client tell him he wants to do the right thing. Why wouldn't at that point? Well, it's all the question of what it, well, here's something that district court found as a factual matter, and this is in the court's opinion, that Mr. Leibniz did not have the consent of Mr. Engelbrecht to come in here and to make any advance disclosure. And the court went through that at length. And you have to understand Mr. Engelbrecht, they aren't your, you know, they aren't your typical civil litigant. These are indigent people, they're drug users. They were in a Santa Ana boarding house when this product blew up. Blew up in a way that was the same, exactly the same as had happened to other people who would use this product who weren't using drugs. And he had been, and he suffered, 70% of his body had been, he had suffered through second and third degree burns. And he's, and it was hard for him to admit that he was an addict. But Mr. Leibniz spent a lot of time with him, and we took a lot of testimony on this point. The judge was quite clear to listen carefully to it, that Mr. Leibniz said, look, I can't, the worst thing I can do when Brad Engelbrecht comes to me and tells me there are some parts of my testimony weren't accurate. And he just said, he didn't say, you were lying to me. And he didn't pound down on me. He said, I wasn't going to be judge, judgmental with him. It was very important for me to continue to have rapport with him and to get him to be comfortable. And he spent a lot of time and he spent months working on that. And it was only as Mr. Leibniz, Mr. Engelbrecht became more and more comfortable as they got very near trial, that, that, that a material part of his testimony said he was, then he basically confessed to Mr. Leibniz that he had smoked meth, I think the day before. And that, that was a new fact, but that was very, very shortly before a trial. Go back to your question about, would they have to withdraw? The answer is under rule 3-700 in California. I'm sorry, say that again. 3-700 of California rules of professional conduct. It only applies to, to prospective violations. And we cited what California lawyers call the Rudder Guide, R-U-T-T-R, which stands for the proposition that past wrongs, the fact that your client has done something wrong in the past doesn't mean you have to withdraw. And then, but, but the mandatory duty only arises where you believe as a member of the bar that your continued employment will inflect, result in a violation of the rules. And so what Mr. Leibniz knows is that Mr. Engelbrecht has said to him, I'm going to tell the truth. And they spent a lot of time talking about it and making him comfortable so he can come in and he, and he could talk about it. And that was classic remonstration. And the court found that there's no factual dispute about the following, that at all times, Mr. Leibniz believed that Mr. Engelbrecht was going to tell the truth. So he had no reason to believe there, there were, there would be a prospective violation. And that the court also found as a factual matter, your honor, that Mr. Leibniz at all times, that was the word, those were the words of the district court, followed the correct path, which was to remonstrate with the client and to ensure that the central core hypothesis that his client was testifying about as to what happened in this case, that that remained unchanged and it always did. And so he did comply with all of his ethical duties. Member of the court also said that I'm not sure I would withdraw, I would have granted a motion to withdraw anyway. Judge Carney said that. It was an old case. And you have to remember that Mr. Liebeck, this is something that he specializes in. He specializes in suing, in suing Worthington. He has a blog about it. They don't like him. And these are indigent plaintiffs who have a meritorious case. And Mr. Liebeck believes he's telling the truth and he's telling me he's going to come clean about it. And just like his partner, Mr. Millman said to Mr. Liebeck, make sure, thanks for letting me know, because Mr., the, the, the uncontroverted evidence too, is that Mr. Engelbrecht wouldn't even allow Mr. Liebeck to tell his partner until shortly before trial. And shortly before trial, he tells Mr. Millman and Mr. Millman says, okay, you just make sure though, when he gets in there, he steps up and he comes to Jesus and he tells, and he tells the truth. So in California, you cannot withdraw if it's going to cause prejudice to the client. Where were Mr. Engelbrecht and Ms. Hernandez going to go get lawyers who knew the fundamentals of this case, of this defective product, a product that has killed people, has maimed people. And here, frankly, Worthington got a little bit lucky. They had plaintiffs who weren't the best at testifying. And if they ever could get a dream plaintiff as a Worthington, one of their products blows up, they got it in Brad Engelbrecht and Maria Hernandez because they aren't people sitting in a skyscraper who can sit there with counsel and with jury consultants and figure out how to make it smooth. They aren't those kinds of people. They're not sophisticated people. They've had tough life. Does not excuse their perjury, but they had good, passionate lawyers who were presented with a dilemma that is unique in our country. I know all three of you, I don't believe you're, I'm not sure. I don't think I've, Montana, Arizona, and the state of Washington, I'm not sure anyone here has been a member of the California Bar, but the one thing you learn, we never adopted the model rules. And I do a lot of ethics work and I actually like it. I like that there is a bright line in California when it comes to the question of client confidences. You cannot reveal them. There is no duty to require lawyers to go to their client and demand that they waive the attorney-client privileges, which is the premise of one of the arguments here today. So the other thing is, look at it like this on the withdrawal question, that if they would have withdrawn under California law, you cannot disclose the perjury. Very clear. It doesn't fix the problem, it makes it worse. Engelbrecht and Hernandez rather than left without a lawyer, as Judge Carney said, he goes, they may well have been conditioned at that point, oops, I told my lawyer the truth and now they fired me. So they get new lawyers, they may not tell them the truth. And that new lawyer is going to have the same ethical dilemma. You mentioned California law, you can't withdraw if your client will be prejudiced, but I thought there was a provision in that rule that says you can if you take steps to prevent prejudice. Correct, correct. I misstated. So what steps could they have taken? They would say, we need to get a continuance because we cannot put you in a position where you have to go get a new lawyer who knows this kind of fact scenario. And there are a lot of expert witnesses. They talk about the toxicology test support them. We had testimony from two doctors that supported the good faith belief of counsel. But you, but they, the trial judge may, this is federal court, central district, they're loathe to give continuances in the very old case. He may not have given a continuance. That's not clear. In fact, he said he may not have done that. But again, it brings in a new lawyer who has the same ethical dilemma. And I, so the, so the case is counsel. Remonstration is the desired course. And that's what Mr, that's what Mr. Leibig did. I've got three, three minutes, your honor, your honors. I just, Worthington cannot point to any legal error. The notion they've made the false argument and eventually over time, they've, they've come closer to cleaning it up a little bit, but they, but to try to put, to subject California lawyers to the ABA model code, it just doesn't work. That's not the law. And the central district of California, to even be a member of the central district, you have to be a member of the California bar and you have to agree to follow the California rules of professional conduct, business and professions code 6068E. You shall protect client confidences to your own peril. And now they're in peril. I just want to point, again, I point out that the court, the district court did make a factual finding that Mr. Leibig did not have authority to make the disclosure and that, that Mr. Engelbrecht did not give him the consent and the court made the factual finding as well that Worthington has never been able to prove any proximate causation. And that, that record's very clear that Worthington, they put in a dec, a declaration and a testimony from one of their many, many lawyers on their trial team, Mr. Nagle, who's cross-examined and said, I have to think about whether there's a could not identify any specific things they would have done differently. And Mr. Mr. Ergo, who's sitting over at the council table in his declaration in connection with the motion for sanctions said, if you find there should be sanctions, then we'll show you concrete examples of things we would have done differently. They would never have done anything differently. Judge Carney found that as a factual matter. I have 45 seconds, Your Honor. We also have a motion for sanctions, which we rarely asked for. That's in connection with the briefing problem that they had in their reply brief. Is this the trial transcript issue? No. Yeah. Yeah. Yeah. This may, may I speak to that in my 22 seconds? 20 seconds. Uh, well, this, what happened is docket 63 is the court's order, uh, the November 2nd, that that motion is referred to the panel to decide on the merits. My client spent $8,800 dealing with that, with that problem of Worthington's council putting in matters into the record that they concede were never presented to the trial court in connection with the, with, with, uh, the motion. And then we called them before we filed the second motion and asked them, what, what gives? The lawyer who signed the brief, Ms., uh, Ms. Wong said she didn't know. The other lawyer said, no one may... Trial transcripts we can review as part of the record under our ninth circuit law. So I'm not sure that's well taken, but you're out of time. Let me see if Judge Gould has any questions. I did have a question. So the argument that the appellant was making that they spent millions of dollars, uh, preparing witnesses and so on and arguments because of the initially false testimony, you're saying that there's no merit to that under the district court's finding that there was no proximate cause? Yes. The, what the, uh, district court did, and it was quite clear about this, um, it, it, it spoke about the various opportunities that Worthington's council had been given to offer examples of things that they would have done differently. And as we argued at at the evidentiary hearing is that when you think about what Worthington's case theory was, what part of their case was, these are really bad people. Okay. Um, which is fine for them to make, to make their, but the other theory was though that at the moment that that canister blew up in their boarding house, they were smoking meth, but that, but that, but that, but that wasn't enough. But that wasn't a fact that was ever admitted by Mr. Engelbrecht. Right, right. And never, never admitted to his council. Right. So they still had to defend the underlying product liability case. Worthington has always argued that what happened is that Brad Engelbrecht in a, in a, in meth induced, meth, meth induced rage, grabbed the cylinder and threw it down on and that caused it to fracture and that caused the room to turn into a fireball. And let's never forget that they also have claimed that they were engaging in deviant sex at the same time, because they made the argument that people who engage in deviant sex are likely to smoke meth and they're, and they are likely to do these types, types of things. That's, that is an argument that they made to the district court. So the point is they always had a case there that could not deal with the problem. That the way Brad Engelbrecht and Maria Hernandez described the sequence of events, which is suddenly there's a small flame coming out of the neck of the canister and there was a fracture in the neck of the canister. And then suddenly you try, you, you drop it on the ground because you're holding something that's on, that is on fire. And then because gas has been leaking, the room turns into a fireball. That's what happened to innocent people. We put on, my clients put on evidence of three other people. Some were welders, utility people who had the unfortunate experience of being around this product when they're doing their jobs. They aren't smoking meth and the thing blows up in their face. And Worthington always had to deal with the problem. We got to show meth-induced rage. And so they would have taken all the discovery they did was focused at this cumulative, making them look bad, making them look like they're crazy people, frankly, making them look like they're low-lifers. That was part of the defense theory. Let's just be blunt about it. I guess they're entitled to do that. But they could never, they, they, they never shook Brady Engelbrecht about at the, on the day of, did you smoke? What were you doing at that, at that moment? And he met, and he continued to tell his own lawyers. And I want to say one other thing about the, the emails. The emails do not support what client, what counsel told you. The emails support lawyers doing the following, questioning their client, saying, what about this fact? How do you explain that? That's good lawyering. That's not something to chide them about and go, because you ask questions, it must mean you, that you've decided your client's a lawyer, that your client's a liar. That's just good lawyering. And then you have the email from Mr. Engelbrecht that Judge Carney quoted from, where he thanks counsel in 2013. He said, it was only after you ranted at me for as long as you did that I decided I would tell the truth no matter what happened, even if I got sanctioned. And that wasn't self-serving. That was in 2013. Mr. Engelbrecht, no one dreamed that that would be produced in discovery in 2006-16. Judge Carney saw fit to quote that, and that's a compelling piece of evidence. Counsel did their job. They did their job. The price has been paid. The people that were culpable were Hernandez and Engelbrecht, and they, and they, they've paid the price. But I, but I will say. Let me just see if Judge Gould has any other questions. I have other questions. I appreciate the arguments. Thank you. Thank you all. Ms. Wong, I'll give you one minute. We have 35 seconds, so I'll give you one minute. Thank you very much. Actually, you know, we let counsel go over by about three minutes, so I'll give you three minutes. Three minutes. Thank you very much. First of all, I want to address this idea that we weren't harmed. The Ninth Circuit, actually, in its last order said that, had plaintiffs been truthful at the outset of the case, Worthington never would have had to spend so much time and money to prove that plaintiffs' denials were lies. Counsel did not do their job. They did not do their first and foremost duty of counseling their client to immediately correct false deposition testimony. And that's why we've had to spend so much money throughout this protracted four-year litigation to expose their lies. They claim that they did the remonstrate duty. They did not. The remonstrate deals with sitting down with your client and confronting them about false deposition testimony and urging them to correct that immediately. I'm glad counsel brought up ABA model rules because the district court did not apply the State Bar opinion since it was in the context of bench trial. However, perjury is perjury, but the ABA model rules that deals with false deposition testimony illustrated the same duties that counsel must take, and that is, if you know or you suspect that your client has lied under deposition, you must urge them to change his deposition testimony immediately. There's absolutely no evidence of that, so counsel failed to do that job and in violation of their ethical duties under California law. Just quickly about application ABA model rules, we don't need to rely upon it because we're not saying that they need to disclose their clients' confidences. We don't even need to get there. Since we have evidence that Mr. Engelbrecht consented to telling the truth at least a year before trial, so with that consent, they are authorized. What about the finding, counsel? Yes. What if there was a finding of fact by the district court that that he never authorized counsel to disclose this? That's incorrect, your honor. In fact, this is what the court found. The district court found that counsel Liebeck testified during the evidentiary hearing that counsel Liebeck did not seek Mr. Engelbrecht's consent to tell Worthington and the court about the changed testimony before trial, even though the district court specifically found that counsel already knew at least a year before trial that there were multiple perjuries under So why did they wait? In none of the duties, the codes, the model rules that we've cited, is counsel able to wait until two weeks into trial before springing upon these admitted perjury on your opponent? Our judicial system is not based on sandbagging. This is one of the greatest countries in the world, in part because we have a judicial system where one can seek justice based on truth. If counsel is not going to ensure that only truth is being litigated, then a foundation of this courtroom is compromised. And that's what happened in this case. We had to spend amount of money that we're asking to be awarded in terms of sanctions because we had to spend a lot of money in search of truth. And that's just not something that a litigant should be forced to do. And that is something that counsel should never do because it's in violation of their Yes. I'm taking you over your time, but answer this, if you would, please. How do you answer the argument of your colleague on the other side of the case that your client was given the opportunity to present evidence of what they would have done differently and that, you know, they're motivated to defend against the flaming canister no matter what, that they'd have to do all that and that they don't present any evidence of what they do differently? We take issue with that. This case, one of the errors that district court had committed was when he mentioned that there Inglebrook took the stand and admitting to multiple perjury and suspend the trial so that he could entertain our motion for sanctions based on perjury. So we never had the ability to put on evidence that our product is robust. After selling over 24 million of these cylinders, we had a defect incident rate of 0.00007 percent. You're not really answering my question, which is what evidence did you present of what you would have done differently if the plaintiff hadn't had not perjured himself? We wouldn't have to have taken over 30 depositions of third party witnesses, retained experts, and we had to do that because Mr. Inglebrook and Ms. Hernandez on a wholesale basis denied using meth, denied being under the influence of meth at the time of trial. Now that was critical because they were the only two eyewitnesses to that product liability accident that happened at 6 a.m. in their bedroom. There was no one else to tell us what happened. Was this caused by a product defect? Was this caused by product misuse? Okay, thanks. You've answered my question now. Thank you. Thank you very much. Thank you very much. Thank you. Mr. Wong, is it Wong? Yes. All right. And Mr. Hodel, thank you both very much for your excellent arguments here today. We appreciate it. And we'll be in recess. The case of Worthington Industries versus Hodes-Millman-Lybeck is now submitted and will be in recess. Thank you.
judges: Gould, Murguia, Christensen